616 A.2d 365

**STATE of Maryland**

v.

**Donald THOMAS.**

**No. 30, Sept. Term, 1992.**

Court of Appeals of Maryland.

Dec. 9, 1992.

542

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellant.

H. Mark Stichel (Edward K. Dunn, III, Piper and Marbury, William Kanwisher, Asst. Public Defender, all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

In this post conviction case, we once again consider the issue of whether Donald Thomas is entitled to a new sentencing hearing for his murder of Sarah Spurling, on October 2, 1981, in Baltimore County. *See State v. Thomas,* 325 Md. 160, 599 A.2d 1171 (1992) (*Thomas II*); *Thomas v. State,* 301 Md. 294, 483 A.2d 6 (1984) (*Thomas I*), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985). In *Thomas II,* we set forth the proceedings which preceded our review of an order of the post conviction court vacating the death sentence imposed upon Thomas and ordering that he be granted a new sentencing hearing:

"On November 18, 1982, a jury in the Circuit Court for Baltimore County convicted Donald Thomas of the first degree murders of Donald Spurling and his wife, Sarah.[1] At the same trial, Thomas was also found guilty of the first degree rape of Noel Wilkins, of committing two first degree sexual offenses upon Ms. Wilkins, and of robbing her at knife point. Having been previously given the required statutory notice that the death penalty would be sought for the first degree murders, Thomas elected to have the trial judge decide whether he should be executed for those crimes.

"On December 13, 1982, Thomas was sentenced to life imprisonment for the murder of Donald Spurling, death for the murder of Sarah Spurling, concurrent terms of life imprisonment for the first degree rape and first degree sexual offenses, and a twenty-year consecutive sentence for the armed robbery. This Court affirmed the judgments of the circuit court as to both the convictions and the sentences, including imposition of the death sentence. [*Thomas I, supra.*] The Supreme Court of the United States denied Thomas's petition for writ of certiorari.

"Thomas then filed a petition for post conviction relief. Thomas sought a new trial, or in the alternative, a new sentencing hearing. After conducting an evidentiary hearing on the petition, the court found no merit in the claims that Thomas had been improperly convicted but vacated his death sentence and ordered a new sentencing hearing. This relief was granted because the court concluded that trial counsel had failed to render Thomas effective assistance when he permitted Thomas to be reexamined by Dr. Michael Spodak following his convictions in preparation for Dr. Spodak's testimony at the sentencing hearing."

1. A statement of facts describing the murders of Sarah Spurling and her husband, Donald Spurling, appears in *Thomas I,* 301 Md. at 301–06, 483 A.2d at 10–12.

*Thomas II,* 325 Md. at 165–66, 599 A.2d at 1173 (citations omitted). Also, in *Thomas II,* we recited the factual predicate for the order of the post conviction court:

"In an indictment filed on November 9, 1981, Thomas was charged with the crimes of which he now stands convicted. He entered pleas of not guilty by reason of insanity and incompetency to stand trial. Pursuant to Maryland Code (1957, 1979 Repl.Vol.), Art. 59, §§ 23–28, the court ordered that he be transferred to the Clifton T. Perkins Hospital Center for a mental examination and evaluation.

"Dr. Spodak, a member of the staff at Clifton Perkins, after conducting a psychiatric examination of Thomas, prepared a 'psychiatric case work up report.' Reports were also prepared by one of the hospital's social workers who had interviewed Thomas and by a clinical psychologist who related his findings upon his testing of Thomas. On February 4, 1982, Thomas appeared at a conference at Clifton Perkins attended by Dr. Spodak, the social worker who had interviewed him, the clinical psychologist who had tested him, and three other staff psychiatrists. Thomas was further interviewed at this conference. It was the unanimous opinion of the psychiatrists present at that conference that [Thomas was competent to stand trial, and]

" 'At the time of the alleged offenses, Mr. Thomas was not suffering from a mental disorder which caused him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.' "

Those conclusions were reported to the court. . . .

"In light of the Clifton Perkins evaluation, R. Clark Kinsley, Esq., the public defender assigned as Thomas's trial counsel, arranged to have him examined by a psychiatrist of his choice, Dr. B.F. Beran. That examination produced no evidence with which to contest the evaluation of the Clifton Perkins staff, and Mr. Kinsley so advised the court at the outset of the trial on October 18, 1982.

The court concluded that Thomas was competent to stand trial. Thomas was then re-arraigned and entered a plea of not guilty to all of the charges pending against him.

"After the jury returned its verdicts, the State petitioned the court for permission to conduct a pre-sentence psychiatric evaluation of Thomas. It represented in that petition:

" '1. That the Defendant was evaluated at the Clifton T. Perkins Hospital Center following his entry of a plea of not guilty by reason of insanity;

" '2. That the findings of the Hospital Center are contained in a report to the Court dated February 4, 1982;

" '3. That it is desirable to supplement the original insanity evaluation with further interview(s) of the Defendant to develop material for presentation at sentencing;

" '4. That Dr. Michael Spodak, who participated in the insanity evaluation, can conduct such further interview with the Defendant at the Baltimore County Detention Center and can do so within a few days of a court order authorizing such evaluation;

" '5. That counsel for the Defendant has no objection to such an evaluation.' The court granted that petition, and Dr. Spodak interviewed Thomas on November 27, 1982. Before the interview began, Dr. Spodak advised Thomas that he had been 'retained by the State's Attorney's office ... to evaluate him on certain issues concerning the death penalty and that depending on what he said and depending on my findings, I might very well be called as a witness to testify at the sentencing phase.' Dr. Spodak also testified that Thomas indicated that he understood that explanation and was willing to be interviewed at that time.

"Dr. Spodak wrote to the office of the State's Attorney on November 30, 1982. He stated that based upon his several interviews with Thomas as a member of the staff of Clifton Perkins, the interview he conducted on November 27, and the review of records associated with the case he was of the opinion to a reasonable medical certainty

that the murders of Donald and Sarah Spurling were not committed while the capacity of Thomas to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance or intoxication. He further opined that it is not unlikely that Thomas would engage in further criminal activities that would constitute a continuing threat to society. These opinions negated two possible circumstances which might mitigate against the death penalty pursuant to Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 413(g)(4) and (7).

"At the sentencing hearing, the State called Dr. Spodak as a witness. Mr. Kinsley, who had been provided a copy of Dr. Spodak's report to the State's Attorney's office on November 30, 1982, objected to any opinions being expressed by Dr. Spodak. He argued that he was under the impression that Dr. Spodak would interview Thomas as a neutral expert from the Clifton T. Perkins Hospital Center when he consented to the interview of Thomas following the jury's verdicts. He stressed that, had he been aware that Dr. Spodak had been employed by the State's Attorney's office to conduct that evaluation, he would not have consented to the evaluation. The court overruled the objection and admitted Dr. Spodak's testimony and his November 30, 1982 report....

"In his petition for post conviction relief, Thomas asserted that Kinsley, in allowing him to be interviewed without counsel by Dr. Spodak post-verdict and pre-sentence, had rendered him ineffective assistance of counsel, prejudicing him at sentencing in violation of his right to counsel under the Sixth Amendment. At the post conviction hearing, Thomas called Kinsley as his witness and questioned him extensively on his rationale for allowing Thomas to be re-examined by Spodak. Kinsley explained that he believed that Spodak's role in re-examining Thomas was that of a neutral expert from the Clifton T. Perkins Hospital Center, and that Spodak would therefore

be impartial. He further testified that he instructed Thomas to cooperate fully with Spodak in the hope that something beneficial to Thomas might come from the examination. During cross-examination, the State attempted to elicit testimony from Kinsley regarding the results which he had received of Dr. Beran's pretrial psychiatric examination of Thomas. The court sustained Thomas's objection to that line of questioning. Following ... the hearing ..., the hearing judge ... grant[ed] Thomas a new sentencing hearing but den[ied] him any post conviction relief from his convictions."

*Thomas II*, 325 Md. at 166–69, 599 A.2d at 1173–75.

In *Thomas II*, we held that the post conviction court committed reversible error when it sustained Thomas's objection to the State's attempt to elicit from Kinsley his understanding of the results of Dr. Beran's psychiatric evaluation. 325 Md. at 173, 599 A.2d at 1177. In reaching that conclusion, we rejected Thomas's assertion that any conclusions reached by Dr. Beran were protected from disclosure by Kinsley because of the attorney-client privilege. *Id.* at 173–74, 599 A.2d at 1177–78. In light of the post conviction court's error and the standards by which we measure ineffective assistance of counsel, which were set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we "remand[ed] the case for admission of that excluded testimony and further consideration, in light of that evidence, of the reasonableness of Kinsley's decision to permit Dr. Spodak's post-verdict, pre-sentence interview." *Thomas II*, 325 Md. at 173, 599 A.2d at 1177.

We recognized that "[t]he Supreme Court [had] stressed in *Strickland* that '[a] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct.*'" *Thomas II*, 325 Md. at 173, 599 A.2d at 1177 (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695) (emphasis in *Thomas II*). In remanding the case to the post convic-

tion court, we stated that "what Dr. Beran related to Mr. Kinsley with regard to his psychiatric evaluation of Thomas was highly relevant to the reasonableness of the strategy employed by Kinsley in agreeing to permit Dr. Spodak to interview Thomas." *Thomas II*, 325 Md. at 175, 599 A.2d at 1178.

In *Thomas II*, in addition to Kinsley's decision to permit Dr. Spodak's post-verdict, pre-sentence interview, Thomas alleged that Kinsley rendered ineffective assistance of counsel when he failed to consult with another psychiatrist or psychologist prior to Thomas's sentencing hearing. 325 Md. at 178–79, 599 A.2d at 1179–80. Again, in light of the post conviction court's error and the teachings of *Strickland*, we held "that without the admission of evidence revealing what Kinsley knew from Dr. Beran's pre-trial psychiatric evaluation of Thomas, a court cannot fully evaluate Kinsley's effectiveness in this regard." *Id.* at 179, 599 A.2d at 1180.

We, therefore, remanded the case to the post conviction court for admission of the erroneously excluded evidence and further consideration, in light of that evidence, of the reasonableness of both of these decisions by Kinsley.

## I.

On April 9, 1992, the circuit court held the supplemental post conviction hearing mandated by *Thomas II*. At this evidentiary hearing, Thomas presented testimony from two witnesses, Dr. Beran and R. Clark Kinsley. Dr. Beran testified on direct examination that prior to Thomas's trial he had never indicated to Kinsley that he, Dr. Beran, had reached any preliminary or informal conclusions adverse to the defense on insanity, competency, or any other psychiatric or psychological issues that might arise at the sentencing phase of Thomas's trial. In fact, Dr. Beran testified that he was "quite optimistic in terms of . . . providing very significant data to help [Thomas's] insanity defense," and that he had communicated this to Kinsley. Dr. Beran

testified that he was prevented from reaching any formal conclusion because Kinsley had failed to provide the necessary "leadership," particularly in failing to help Dr. Beran formulate the proper questions that he was to ask Thomas as the examining psychiatrist.

On cross-examination, Dr. Beran acknowledged that he had evaluated other defendants who had been charged with murder for the purpose of determining the validity of an insanity defense. Dr. Beran conceded that there was much correspondence from Kinsley that was materially inconsistent with Dr. Beran's current testimony that he could have provided Thomas with helpful opinions but for Kinsley's lack of "leadership" and support. Dr. Beran acknowledged receiving a letter written by Kinsley in which Kinsley authorized and urged Dr. Beran "to do all needed and necessary tests and bring in any required discipline to augment [his psychiatric] studies in this case." Moreover, Kinsley stated in this letter that he was willing to obtain whatever court order necessary to authorize any such tests.

Dr. Beran also testified on cross-examination that he had made some partial findings, which he had conveyed to Kinsley, that supported Thomas's insanity defense. For example, Dr. Beran testified that "from the interviews [with Thomas] I could see that the patient had what we call poor ego boundary definition. There was a problem consistent with possible occurrences of psychosis at different times, possible homosexual panic, possible paranoid kind of development, and that needed to be explored further." Dr. Beran stated repeatedly on cross-examination that he had conveyed these findings to Kinsley. When confronted with his only letter to Kinsley dated October 14, 1982, in which none of these findings is mentioned, Dr. Beran testified that he communicated these findings orally to Kinsley. During cross-examination, Dr. Beran acknowledged that in evaluating Thomas he had read a psychological evaluation report on Thomas written by Professor Robert Brown, a psychologist whom Kinsley had authorized Dr. Beran to retain. Brown's report indicated among other things that there was

"no indication for psychosis, for obvious CNS dysfunction, nor for major emotional distress." While disputing Brown's findings as being contrary to his findings that he purportedly had conveyed orally to Kinsley, Dr. Beran conceded, under questioning by both the State and the trial court, that Brown's findings were consistent with a conclusion that Thomas was not only sane but had a propensity for future dangerousness.

Following Dr. Beran's testimony, Thomas called Kinsley as his second witness. Under questioning by Thomas's post conviction counsel, Kinsley testified that Dr. Beran had communicated unequivocally his unsuitability to being called as a defense witness in Thomas's case. Kinsley testified as follows:

"I do recall that [Dr. Beran] was very much obsessed with the thought that there was no help that he could give this Defendant. He asked me repeatedly don't call me as a witness, I can't help your man, and indeed it is possible I could be very harmful to him, very harmful. He emphasized that over and over again."

In a colloquy with the trial court, Kinsley repeated his recollection of Dr. Beran's communications:

"THE COURT: When did he say to you don't call me as a witness?

"[KINSLEY]: On my last—probably on the telephone, but specifically I know for sure when I looked him eyeball to eyeball in his office and pinned him down; I can't help you, I can't help you, don't call me as a witness, I could be dangerous, you wouldn't want me as a witness, I could hurt him.

"Well, he convinced me that he could hurt [Thomas]. So, there was nothing that would support the insanity plea, number one."

Contrary to Dr. Beran's testimony, Kinsley testified that he inquired of Dr. Beran whether he could help Thomas, should he be convicted, by testifying at the sentencing hearing on issues of mitigation. In recalling why he decid-

ed not to call Dr. Beran to testify at the sentencing hearing, Kinsley testified:

"I'll tell you what he said and, more particularly, what he did. I think it was his body language more than what he said. When I was discussing what possible help he could be at the sentencing hearing and, in particular, what kind of person could we expect if he was ever released back into society, I recall very vividly the expression on his face as though he had bit into a sour lemon and squeezed up like he was experiencing a chill. When I asked him what kind of man he would be, he said, Bad, bad man. Now, you don't go back to a guy like that and put him on the stand."

Kinsley also testified to the impact that Professor Brown's psychological evaluation report on Thomas had on his decision to permit Dr. Spodak's post-verdict, pre-sentence interview of Thomas. During his testimony, Kinsley was referred to the following two particularly damning statements that appeared in Brown's report:

"[Thomas's] tendency to present himself as passively compliant, unassertive, and emotionally unreactive also leaves him susceptible to being overwhelmed by strong affect, with a potential for sudden explosive outbursts (as *e.g.* of angriness or rage) that may not seem to make much sense to himself or others. In the present instance any perceived threat to his life (or to manly self-esteem) might well have acted to trigger the uncontrolled explosion of fear and rage which apparently took place, and for which he seems to have little clear recollection."

Referring to the first sentence, Kinsley testified that that sentence "worried the devil out of me to have the judge hear that when I'm asking in mitigation." Kinsley testified that in his opinion, the second sentence reflected adversely on Thomas's aggressiveness and potential for violence in the future. In fact, he testified that he believed "it was dynamite against us." Kinsley's testimony indicated that his post-trial decision to permit Thomas to be interviewed by Dr. Spodak was influenced significantly by both Dr. Beran's

communications and the report by Professor Brown. Kinsley testified:

"Well, there was nothing to indicate that [Thomas's] personality changed so that he wouldn't have this sudden explosion of rage. So, I would be very naive to think that it couldn't possibly happen again. Then you couple that with what I found out from Dr. Beran, that if released to society what kind of person he would be, he would be bad, bad, you don't need much more to convince you."

Kinsley's responses to the following questions asked of him during the supplemental post conviction hearing are particularly instructive on characterizing the reasonableness of his actions. Two of these questions were propounded by the post conviction court and answered as follows:

"THE COURT: Once [Dr. Beran] said to you I can't help you, don't call me to the stand, what steps did you take to get another doctor involved on behalf of your client?

"[KINSLEY]: Well, ... the file contains a very fine written medical report from Professor Brown which lent no help to me.

"So we have three psychiatrists at Clifton T. Perkins saying he is sane,[2] nothing more than a bland report really; we had two medical men that we brought into the case saying he is sane, there is nothing we can do to help you. The Public Defender doesn't have the money to shop around for a favorable report. I had enough information from five medical people to convince me that shopping around for a favorable report wasn't our business and I didn't do any more shopping or didn't do any shopping...."

---

**2.** The record indicates that there were actually four psychiatrists, including Dr. Spodak, that took part in the psychiatric evaluation at the Clifton T. Perkins Hospital Center on February 4, 1982. *See supra* p. 545.

"THE COURT: ... What were you thinking at the time that you said sure, go ahead? Why did you let [Thomas] go [to the interview with Dr. Spodak]?

"[KINSLEY]: I was thinking that Dr. Spodak, who I thought was still an employee of the State of Maryland, that he was a disinterested, fair, impartial psychiatrist. I could get nothing out of my medical magicians and I thought that if we have Spodak go down who gave us a report initially, gave it to the State as well as a copy to me, it was a bland report, I thought there was a possibility, not having anything of my own to support insanity or let's say a mitigating medical opinion, I thought why not."

Kinsley's responses to two questions propounded by James Gentry, the Assistant State's Attorney, are particularly salient:

"[MR. GENTRY]: Did you have the hopes of obtaining a favorable opinion or favorable diagnosis from Dr. Spodak at the time of sentencing when [Thomas] was being interviewed for the purposes of sentencing?

"[KINSLEY]: Something to hang my hat on. Whether you call it a diagnosis or not, I don't know, but anything to convince poor Judge Hormes—I wish he were alive today to testify—something to convince him that the death penalty should not have been imposed against this poor person.

"[MR. GENTRY]: Correct me if I'm wrong. The reason that you were hopeful and the reason that you didn't object to Dr. Spodak's interview is because the other doctor's had given you nothing favorable and you were hopeful at least that you would have something favorable to hang your hat on?

"[KINSLEY]: That is exactly the case."

Following the conclusion of Kinsley's testimony, the post conviction court heard final arguments and issued its ruling on April 20, 1992. The post-conviction court determined that Thomas was denied effective assistance of counsel when Kinsley permitted Dr. Spodak's post-verdict, pre-sen-

tence interview, and for the second time, granted Thomas a new sentencing hearing.

The post conviction court based its ruling on two grounds. First, the court stated that, in light of Dr. Beran's communications to Kinsley that he could not help Thomas and may in fact harm Thomas if called at the sentencing hearing, no reasonable defense attorney would allow even an independent psychiatric investigation. The post conviction court reasoned that "[i]f your own expert says I'll hurt, then it is absurd to suggest that an independent qualified expert is going to find something that will help." For the second ground on which the post conviction court relied in granting Thomas relief, the court stated that, even if the decision to permit the interview by Dr. Spodak was permissible, Kinsley should have attended the interview and failing to do so rendered ineffective assistance of counsel.

Additionally, on the issue of whether Kinsley rendered ineffective assistance of counsel by failing to consult with another psychiatrist or psychologist prior to Thomas's sentencing, which was the second question in *Thomas II* that was to be answered on remand, the post conviction court rejected this claim and denied Thomas any relief on this ground.

After a brief review of the well established *Strickland* principles, we will address *in seriatim* each of the post conviction court's conclusions as to Kinsley's performance.

## II.

As noted earlier, the standards by which we measure whether Thomas received effective assistance of counsel were promulgated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Thomas II*, 325 Md. at 170, 599 A.2d at 1176, we quoted the standard established by the *Strickland* Court at 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693:

" 'A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a convic-

tion or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.' "

As noted in *Thomas II*, 325 Md. at 172, 599 A.2d at 1177, we first applied the *Strickland* tests in *Harris v. State*, 303 Md. 685, 496 A.2d 1074 (1985), revisited its teachings in *State v. Tichnell*, 306 Md. 428, 509 A.2d 1179, *cert. denied*, 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986), *rehearing denied*, 479 U.S. 1060, 107 S.Ct. 942, 93 L.Ed.2d 992 (1987); *State v. Colvin*, 314 Md. 1, 548 A.2d 506 (1988); and *Bowers v. State*, 320 Md. 416, 578 A.2d 734 (1990), and since *Thomas II*, have utilized its teachings again in *Williams v. State*, 326 Md. 367, 605 A.2d 103 (1992).

To establish that counsel's performance was deficient, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *Bowers*, 320 Md. at 424, 578 A.2d at 738. In *Thomas II*, we discussed the deferential review that is accorded to counsel's performance:

" 'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to elimi-

nate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' ' "

325 Md. at 171, 599 A.2d at 1176 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95) (citations omitted). Thus, as the Supreme Court cautioned in *Strickland* and we repeated in *Thomas II:*

"[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."

466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695; 325 Md. at 172, 599 A.2d at 1177.

■ Even if a defendant is able to satisfy the deficient performance prong of *Strickland's* two-prong test, the defendant must show that the deficient performance prejudiced the defense. 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *Thomas II,* 325 Md. at 170, 599 A.2d at 1176. In *Bowers v. State,* we interpreted the prejudice component to require a substantial or significant possibility, rather than a reasonable probability, that but for counsel's unprofessional errors the result of the proceeding would have been different. 320 Md. at 425–27, 578 A.2d at 738–39. We applied this prejudice standard in *Williams v. State,* 326 Md. 367, 605 A.2d 103 (1992) and will not retreat from it in the instant case.

As we recognized in *Harris,* " 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' " 303 Md. at 696, 496 A.2d at 1079 (quoting *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069, 80

L.Ed.2d at 699). The Supreme Court stated: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. Finally, "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070, 80 L.Ed.2d at 700; *Harris,* 303 Md. at 696, 496 A.2d at 1079.

## III.

In determining that Thomas received ineffective assistance of counsel, the post conviction court concluded that Kinsley's decision to allow the post-verdict, pre-sentence interview of his client by Dr. Spodak, after having received categorically adverse psychiatric opinions from Dr. Beran, fell below the objective standard of reasonableness demanded by *Strickland.*[3] On remand, the post conviction court was confronted with two distinct versions of the nature of the communications that occurred nearly ten years ago between Dr. Beran and Kinsley. Dr. Beran testified that he was optimistic about providing data to support Thomas's insanity defense and denied that he had communicated any conclusions to Kinsley regarding possible sentencing issues. Directly contrary to Dr. Beran's testimony, Kinsley testified that Dr. Beran indicated that he could not provide support for Thomas's insanity plea. Moreover, Kinsley testified

---

**3.** As pointed out by one of the dissenters in *Thomas II:*
"The State does not seriously contend, except insofar as the argument regarding counsel's failure to attend the psychiatric interview is concerned, that counsel's conduct, if deficient, did not prejudice [Thomas]. In any event, the trial court's findings in that regard are quite clear, and to my mind, amply supported by the record."
*Thomas II,* 325 Md. at 193 n. 1, 599 A.2d at 1187 n. 1 (Bell, J., dissenting). In addressing Kinsley's decision to permit the post-verdict, pre-sentence interview, we agree with Judge Bell on the issue of prejudice. In determining whether the decision to permit the interview amounted to ineffective assistance of counsel, we address only the deficient performance prong of *Strickland.*

repeatedly that Dr. Beran urged Kinsley not to call him as a defense witness at either the trial or the sentencing hearing, inasmuch as his testimony could harm Thomas. The post conviction court resolved this dispute by accepting Kinsley's version of the communications. The post conviction court stated: "I am satisfied that Kinsley was told more than I cannot help. I'm satisfied Kinsley was told my testimony would affirmatively harm him."

In light of Dr. Beran's communications to Kinsley, the post conviction court concluded that no reasonably competent defense attorney would have permitted Thomas to be interviewed by an independent psychiatrist following the verdict and prior to sentencing. We disagree.

Were we to conclude that Kinsley's decision amounted to ineffectiveness of counsel, we would be ignoring several of *Strickland's* tenets. The *Strickland* Court stated that the performance inquiry is simply "whether counsel's assistance was reasonable considering all the circumstances." 466 U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. In addition, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Moreover, in deciding ineffectiveness claims, we must apply a heavy measure of deference to counsel's judgments and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

At the time Kinsley consented to Dr. Spodak's post-verdict, pre-sentence interview, Kinsley's client stood convicted of two first degree murders and was awaiting the sentencing hearing at which the State was seeking the death penalty. At that time, Thomas had been pronounced sane and competent to stand trial by four independent psychiatrists employed at the Clifton T. Perkins Hospital Center, one of whom was Dr. Spodak. Similarly, the experts brought into the case by Kinsley, Dr. Beran and

Professor Brown, could not provide any favorable medical opinions at the sentencing hearing. Kinsley recognized that he did not have unlimited funds to shop around for a favorable report. At the time Kinsley made the strategic and tactical decision to allow Thomas to be interviewed by Dr. Spodak, he was trying to obtain something that he did not have, *i.e.*, a favorable medical opinion which he could use at sentencing.

Only by viewing Kinsley's decision in a vacuum, by using "the distorting effects of hindsight," 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694, and by failing to accord a heavy measure of deference to Kinsley's judgment, *Id.* at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695, could we conclude that Kinsley's decision to permit the Dr. Spodak interview was not a reasonable tactical decision. Each of these qualifications is contrary to *Strickland's* teachings. We, therefore, reject Thomas's assertion that Kinsley's decision to permit the Dr. Spodak interview was not within the wide range of professionally reasonable judgments allowable under *Strickland*. *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

In *Thomas II*, 325 Md. at 173, 599 A.2d at 1177, we hypothesized: "[I]f Kinsley had been told by Dr. Beran that Thomas suffered from no mental impairments and exhibited the likelihood of future danger to society, then Kinsley's decision to allow further examination in the hope of obtaining favorable diagnosis may well have been reasonable." Today, we answer affirmatively our own hypothetical and end Thomas's "Monday morning quarterbacking." Based on the testimony introduced upon remand and the post conviction court's findings of fact, we hold that Kinsley's decision to permit the post-verdict, pre-sentence interview was a reasonable tactical decision consistent with Thomas's constitutional guarantee of effective assistance of counsel.

## IV.

In granting Thomas a new sentencing hearing, the post conviction court alternatively ruled that, even if the

decision to permit the interview by Dr. Spodak was reasonable, Kinsley nevertheless rendered ineffective assistance of counsel by failing to attend the interview. For the reason that Thomas has not satisfied either prong of the *Strickland* test regarding this decision by Kinsley, we disagree.

Kinsley testified that he believed the post-verdict interview with Dr. Spodak would be conducted in a manner similar to the normal pretrial competency or insanity evaluations, in which impartial psychiatrists employed by the Clifton T. Perkins Hospital conduct the examination. Kinsley testified that counsel normally did not attend those psychiatric evaluations. Due to Dr. Spodak's affiliation with the Clifton T. Perkins Hospital, Kinsley testified that he saw no reason to protect Thomas from an ostensibly neutral psychiatrist and testified further that he believed it was beneficial for Dr. Spodak to interview Thomas alone.[4]

Similar to Kinsley's decision to allow the post-verdict interview, the decision not to attend the interview was a reasonable strategic decision. As we previously noted, the *Strickland* Court stated that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." In light of his testimony regarding the reasons why he did not attend the interview and *Strickland's* heavy measure of deference accorded to Kinsley's judgments, we hold that Kinsley's decision not to attend the interview was a professionally reasonable judgment.

Assuming *arguendo* that Kinsley's decision not to attend the interview was professionally unreasonable, Thomas has made no showing of prejudice regarding Kinsley's failure to

---

4. The Supreme Court has acknowledged "that 'an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination.'" *Estelle v. Smith*, 451 U.S. 454, 470 n. 14, 101 S.Ct. 1866, 1877 n. 14, 68 L.Ed.2d 359, 374 n. 14 (1981) (quoting *Estelle v. Smith*, 602 F.2d 694, 708 (5th Cir.1979)).

attend the interview. As we noted in *Harris*, to satisfy the *Strickland* test a defendant must show both that counsel's performance was deficient, *and* that the deficient performance prejudiced the defendant. 303 Md. at 696, 496 A.2d at 1079. To satisfy the prejudice prong, Thomas must show that there is a substantial or significant possibility that had Kinsley attended the interview the result of the sentencing hearing would have been different. *Bowers*, 320 Md. at 427, 578 A.2d at 739. In his brief, Thomas failed to address the issue of prejudice regarding Kinsley's decision not to attend the interview. At oral argument, Thomas similarly failed to point to any evidence of prejudice.

Thus, Thomas has failed to satisfy both the deficient performance component and the prejudice component of the *Strickland* test regarding Kinsley's decision not to attend the interview.

## VI.

On the second issue left open on remand, whether Kinsley rendered ineffective assistance by failing to consult with another psychiatrist or psychologist prior to Thomas's sentencing hearing, the post conviction court rejected Thomas's claim and denied him any post conviction relief on that ground. The post conviction court resolved a dispute between the testimony of Dr. Beran and Kinsley when it found that Kinsley did consult Dr. Beran regarding sentencing issues. The post conviction court found that Kinsley decided not to call Dr. Beran or Professor Brown as defense witnesses as their testimony might harm Thomas. Having consulted with Dr. Beran with regard to sentencing issues and examined Professor Brown's psychological evaluation report on Thomas, Kinsley acted reasonably in not seeking to consult another psychiatrist or psychologist.

Similar to Kinsley's other tactical decisions which Thomas has attacked, we agree with the post conviction court and hold that Kinsley's decision not to consult with another

psychiatrist or psychologist prior to the sentencing hearing was a professionally reasonable judgment.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH INSTRUCTIONS TO DENY THE PETITION FOR POST CONVICTION RELIEF.

ELDRIDGE and ROBERT M. BELL, JJ., dissent.

Dissenting opinion by ROBERT M. BELL, Judge, in which ELDRIDGE, J., joins.

I was one of the dissenters in *Thomas II.  See State v. Thomas*, 325 Md. 160, 193, 599 A.2d 1171, 1187 (1992).  At that time, I was of the opinion that the record was "abundantly clear that petitioner's trial counsel rendered ineffective assistance of counsel to petitioner's prejudice" and that the only effect of remanding the case, as we did, was to "make even more obvious how ineffective trial counsel's performance really was." *Id.* at 193–94, 599 A.2d at 1187 (footnote omitted).  The record developed on remand convinces me that I was correct on both counts.  Therefore, respectfully, I once again dissent.

It is not necessary to repeat all that I said in my prior dissenting opinion.  In view of the majority opinion, however, I find it necessary to reiterate and, perhaps, expand upon a couple of points.

As to the court's first ground for granting post conviction relief—that a reasonably competent defense attorney, equipped with the information Kinsley had as to his client's psychiatric makeup, would not have allowed even an independent psychiatric investigation—the majority is convinced that the decision to permit the petitioner to be interviewed by a psychiatrist proposed by the State was, under the circumstances *sub judice,* a strategic and reasonable one, which, being within the wide range of professionally reasonable judgments, was allowable under *Strickland v. Wash-*

*ington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[1] Majority op. at 560. In so concluding, the majority purports to apply "several of *Strickland's* tenets." Op. at 559. In particular, it notes that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on the investigation." Op. at 561, quoting *Strickland v. Washington,* 466 U.S. at 690–91, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

While focusing on that "tenet" is appropriate, the majority's application of it in this case is not. The majority proceeds as if the only relevant inquiry is whether, given the prior psychiatric evaluations, it was reasonable for defense counsel to permit a further psychiatric investigation of his client by yet another psychiatrist. To the majority, it is apparently irrelevant whether the psychiatrist who is to conduct the evaluation is independent. I see it differently. However bleak the prognosis of the psychiatrists retained by the defense may be and however anxious defense counsel may be to obtain something favorable for sentencing purposes, different considerations obtain when defense counsel knows that a psychiatrist is independent than when he or she knows that the psychiatrist is not. Trial counsel recognized this to be true when he testified that, had he known that Dr. Spodak was a State agent he would not have permitted him to examine his client. Notwithstanding that counsel asked no questions of the State concerning the capacity in which Dr. Spodak was to act and, indeed, did nothing to confirm the assumptions he made as to the nature of the examination the State sought, the majority finds that trial counsel's decision to permit the examination was reasonable and entitled to deference. In so doing, it overlooks, and excuses, a most basic and critical omission.

----

1. The majority agrees that, as to this ground, there is no legitimate issue as to the prejudice prong of the test enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Op. at 558, n. 3.

In my opinion, a strategic decision, not subject to sanction as ineffective assistance of counsel, is one made after investigating and understanding available options and their relevant merits and/or consequences. Given the circumstances of this case, it is clear to me that trial counsel's decision to allow his client to be examined by Dr. Spodak was not such a decision. But, even if it appropriately could be characterized as a strategic decision, as I said in dissent in *Thomas II*, the decision by trial counsel in this case "most assuredly was not one made after a 'thorough investigation of the law and facts relevant to plausible options.'" 325 Md. at 202, 599 A.2d at 1191, quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

An alternative holding of the post conviction court was that trial counsel rendered ineffective assistance by permitting his client to be interviewed by Dr. Spodak alone. Rejecting that conclusion, the majority relies very heavily on the testimony of trial counsel as to why he did not attend the examination. That testimony revealed that trial counsel made certain assumptions about the nature of the examination as well as the capacity in which Dr. Spodak was acting. As we have seen, it did not reveal, nor even suggest, however, that trial counsel made any inquiries to justify the assumptions he made. As was true, therefore, with regard to the main holding, the majority excuses as "a professionally reasonable judgment" basic, and critical, omissions made by trial counsel. In my opinion, in this regard as well, trial counsel rendered ineffective assistance of counsel.

The majority suggests that even if it were error for counsel to have permitted the interview to go forward without being present, the petitioner failed to produce any evidence to prove that he was prejudiced. I do not agree. Counsel testified very clearly and, indeed, emphatically, that, had he been aware of the nature of the evaluation Dr. Spodak would do and for whom Dr. Spodak was acting, he would not have allowed his client to be interviewed. Dr. Spodak testified that before conducting the examination, he

advised the petitioner that he was acting on behalf of the State. It is clear, therefore, that the evidence which formed the basis for the death sentence in this case would not have been generated had trial counsel been present; taking him at his word—deferring to his judgment, if you will—clearly he would have terminated the examination before it started.

Judge Eldridge has authorized me to state that he joins in the views stated herein. He also continues to adhere to the views he set forth, in dissent, in *Thomas v. State,* 301 Md. 294, 340–352, 483 A.2d 6, 30–36 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985) and in *Thomas II. See* 325 Md. at 192–93, 599 A.2d at 1186–87.