Donald THOMAS–BEY

v.

Sewall B. SMITH, Warden, Maryland Penitentiary and J. Joseph Curran, Jr., Attorney General of Maryland.

Civ. No. JFM–94–1284.

United States District Court,
D. Maryland.

Dec. 6, 1994.

H. Mark Stichel, Piper and Marbury, Baltimore, MD, for plaintiff.

Ann N. Bosse, Asst. Atty. Gen., Baltimore, MD, for defendants.

## MEMORANDUM

MOTZ, District Judge.

Donald Thomas–Bey has filed a petition for writ of habeas corpus pursuant to 28

**1218**

U.S.C. § 2254, asserting ten grounds for relief. He has properly exhausted the remedies available to him under state law. Thomas has also filed a motion for an evidentiary hearing to resolve alleged factual disputes relating to four of his claims. Respondents have answered and requested that the petition be denied on all ten grounds without an evidentiary hearing.

In 1982, Thomas was convicted of two counts of murder, rape, and other offenses. He was sentenced to death for one of the murders, and received concurrent life sentences on other of the charges. His conviction and sentences were upheld on direct appeal, but in state postconviction proceedings, a Baltimore County Circuit Court Judge twice ordered a new capital sentencing. The circuit judge's decision was ultimately reversed by the Maryland Court of Appeals, and Thomas now seeks a new trial and/or resentencing.

## I.

On November 18, 1982, Thomas was found guilty by a jury of two counts of first-degree murder in the deaths of Donald and Sarah Spurling. As to a third victim, Noel Wilkins, a college student who was renting a room with the Spurlings, Thomas was found guilty of first-degree rape, robbery with a dangerous and deadly weapon, and two counts of first-degree sexual offense.

Early in the morning of October 2, 1981, Baltimore County Police, responding to a rape call, found the bodies of Mr. and Mrs. Spurling at their residence, both dead from multiple stab wounds. At trial, Ms. Wilkins testified that on the night of October 1, 1981, she heard noises in the house and then Thomas entered her second floor room with what appeared to be a butcher knife. He tied her hands and forced her to engage in various sexual activities. He then bound her with a lampcord, took twenty dollars, and went to the basement in search of a gun. At this point, Ms. Wilkins freed herself and escaped through her bedroom window.

Thomas first pled not guilty by reason of insanity. However, after he was evaluated for sanity and competence by a panel at the Clifton T. Perkins Hospital ("Perkins"), he changed his plea to not guilty. At trial, Thomas admitted stabbing the Spurlings, but argued that he killed Donald Spurling in self-defense, that he killed Sarah Spurling in a frenzied attempt to escape, and that his sexual encounter with Ms. Wilkins was consensual.

Thomas testified that he had met Mr. Spurling earlier on October 1, 1981 when Thomas witnessed a minor traffic accident and offered to be a witness on Mr. Spurling's behalf.[1] Thomas stated that Mr. Spurling offered Thomas money and in an attempt to acquire the money, Mr. Spurling and Thomas stopped at the residence of Sam Houseman to collect a twenty dollar debt owed to Mr. Spurling. Thomas testified that Mr. Spurling beat Houseman when Houseman was unable to pay the debt. After stopping at a bar, the two proceeded to Mr. Spurling's residence, and Mr. Spurling tried to convince Thomas to kill someone who had cost Mr. Spurling a great deal of money. Mr. Spurling then showed Thomas a collection of guns and knives in the basement.

Thomas testified that he told Mr. Spurling he wanted to leave, and that Mr. Spurling asked his wife for money to give to Thomas. She refused to give him any money. Then, according to Thomas, Mr. Spurling told Thomas that there was a "chick" upstairs who "indulged in having sex with black guys," and who said she was willing to have sex with Thomas. Ex. 24 at 36–37. Thomas is an African–American; the Spurlings and Ms. Wilkins are white. Thomas testified that after consensual sex, he returned to the basement where Mr. Spurling showed him a large knife and again discussed the "hit job." Thomas testified that he again refused, and Mr. Spurling "for no apparent reason he stuck me in my leg." *Id.* at 44. Then, with Mr. Spurling still holding the knife, Thomas pushed it into Mr. Spurling's chest and proceeded to stab him repeatedly out of fear.

---

1. Thomas's trial testimony is located at Exs. 24–25, Trial Transcript vol. XVIII, p. 22—vol. XIX, p. 48.

Thomas ran back upstairs where Ms. Wilkins gave him twenty dollars and a pair of jeans. Thomas testified that he saw Mrs. Spurling's body and realized that he must have killed her, but he did not specifically remember anything about stabbing her.

After his conviction, Thomas elected to be sentenced by the trial judge, the late Judge Cullen H. Hormes. Between his conviction and sentencing, Thomas's trial counsel, R. Clark Kinsley, consented to a prosecution request to have Dr. Spodak interview Thomas. Dr. Spodak is a psychiatrist who, as a member of the Perkins panel, earlier had examined Thomas regarding the insanity and competency determinations. Dr. Spodak testified at Thomas's sentencing hearing at which Thomas received three concurrent life sentences and a consecutive twenty-year term for the crimes committed against Ms. Wilkins, a consecutive life sentence for the murder of Mr. Spurling, and a sentence of death for the murder of Mrs. Spurling.

On direct appeal, the Court of Appeals of Maryland affirmed all of Thomas's convictions and sentences. *Thomas v. State,* 301 Md. 294, 483 A.2d 6 (1984) (*"Thomas I"*). Thomas's petition for writ of certiorari was denied by the United States Supreme Court on March 25, 1985. *Thomas v. Maryland,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153. Thomas then filed a petition for post-conviction relief with the Circuit Court for Baltimore County. Judge Joseph F. Murphy, Jr., held an evidentiary hearing and denied the petition on all grounds except that he ordered a new capital sentencing hearing on the claim of ineffective assistance of counsel based on Kinsley's consent to the unchaperoned postconviction interview by Dr. Spodak. The Maryland Court of Appeals upheld most of Judge Murphy's findings, but vacated the grant of partial relief and remanded for a supplemental evidentiary hearing at which evidence as to Kinsley's understanding of the results of pretrial psychiatric evaluations would be admitted. *State v. Thomas,* 325 Md. 160, 599 A.2d 1171 (1992) (*"Thomas II"*). After holding the supplemental evi-

dentiary hearing, Judge Murphy again granted partial relief based on the same ineffectiveness claim. The Court of Appeals reversed and remanded with instructions to deny Thomas's habeas petition. *State v. Thomas,* 328 Md. 541, 616 A.2d 365 (1992) (*"Thomas III"*). The United States Supreme Court denied Thomas's petition for a writ of certiorari. *Thomas v. Maryland,* —— U.S. ——, 113 S.Ct. 2359, 124 L.Ed.2d 266 (1993).

Thomas's second petition for postconviction relief, based on a claim that the use of lethal gas in administering the death penalty is cruel and unusual punishment, was dismissed as moot by the Maryland Court of Appeals after Maryland changed its method of execution from lethal gas to lethal injection.

## II.

■ In four of the ten grounds in Thomas's petition for habeas corpus relief, he contends that his trial counsel's representation violated his Sixth Amendment right to effective assistance of counsel.[2] In order to prevail on any of these claims, Thomas must show (1) "that counsel's representation fell below an objective standard of reasonableness," overcoming a presumption that counsel's conduct was reasonable, and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984).

■ In his first ground for habeas relief, Thomas seeks a new trial based on ineffective assistance of counsel in Kinsley's failure to preserve certain jury selection issues for appeal. During voir dire, the trial court rejected at least fourteen of Kinsley's requests to remove specific venirepersons for cause. Kinsley then used some of his peremptory challenges to remove a number of the challenged venirepersons. However, he

---

**2.** Ineffective assistance of counsel is raised by Thomas in Ground One (jury selection), Ground Six (consent to unchaperoned postconviction in-

terview), Ground Nine (failure to investigate mitigating psychiatric evidence), and Ground Ten (general ineffectiveness).

ultimately used only sixteen of his allotted twenty peremptory challenges because he felt that using the remaining peremptory challenges would result in an even more biased jury since the next four venirepersons were also objectionable. Kinsley also stated on the record that he "accepted" the jury that was seated. Because of Kinsley's failure to use all of his peremptory challenges and his "acceptance" of the jury, the Maryland Court of Appeals held that Thomas had waived his objections to the trial judge's refusal to remove the challenged venirepersons for cause.[3] *Thomas I,* 483 A.2d at 14–15.

### A.

 Thomas has not established that he was prejudiced by Kinsley's allegedly unreasonable failure to preserve his objections to jury selection. Thus, I need not consider the reasonableness of Kinsley's actions. The Supreme Court has directed that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069.

Thomas argues that he was prejudiced because if he had been able to raise his objections to the fourteen "relevant" venirepersons on appeal and if the trial judge had erroneously failed to strike for cause any of the fourteen challenged venirepersons, the Maryland Court of Appeals would have reversed his convictions. However, the recent decision of the Supreme Court in *Lockhart v. Fretwell,* —— U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), teaches that even if the Maryland Court of Appeals would have reversed, Thomas was not constitutionally prejudiced for purposes of a Sixth Amendment ineffectiveness claim on collateral review provided that he received a fair trial.

In *Fretwell,* the habeas petitioner's trial counsel had erroneously failed to object and preserve an issue for appeal that, under the law at the time, would have resulted in a sentence of life imprisonment instead of death. The district court granted the habeas petition based on the ground of ineffective assistance of counsel. The Supreme Court reversed, reasoning that while, but for counsel's error, the outcome of the sentencing proceeding may have been different, the end result was fundamentally fair because in the meantime the death penalty had been held to be a valid sentence in cases like the habeas petitioner's. The Supreme Court held that prejudice analysis must focus on whether the result of the proceeding was fundamentally fair and reliable. "Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee [of effective assistance of counsel] is generally not implicated." *Fretwell,* —— U.S. at ——, 113 S.Ct. at 842 (quoting *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984)).

This standard for prejudice further comports with the policy of federal habeas review of ineffectiveness claims. The writ of habeas corpus is "an extraordinary remedy, 'a bulwark against convictions that violate "fundamental fairness." ' " *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1719, 123 L.Ed.2d 353 (1993) (citations omitted). Since *Strickland* requires that the assessment of prejudice "should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency," 466 U.S. at 695, 104 S.Ct. at 2068. Thomas was not prejudiced by merely losing the opportunity to be retried by a second impartial jury if the first jury was impartial. Thus, in order to determine whether Thomas was prejudiced by trial counsel's alleged in-

---

**3.** The Maryland requirement that a defendant must choose between using all of his peremptory challenges and challenging erroneous voir dire rulings by the trial court is particularly troubling in this case. Thomas, a capital defendant, was placed between the Scylla of foregoing objections to the composition of the jury and the Charybdis of being tried by a jury he believed would be even more biased. While this state-imposed dilemma may implicate the Due Process Clause of the Fourteenth Amendment, Thomas does not raise such a due process claim and is procedurally defaulted from doing so since he did not raise it in his state proceedings. Further, the issue may be foreclosed by the Fourth Circuit's decision in *Adams v. Aiken,* 965 F.2d 1306, 1318 (4th Cir.1992), *vac'd on other grounds,* —— U.S. ——, 114 S.Ct. 1365, 128 L.Ed.2d 42 (1994), which held that a similar scheme in South Carolina did not violate a defendant's constitutional rights.

competence, I must examine only the challenged veniremen who actually served on the jury and decide whether Thomas's guilt was adjudicated in a fair and reliable manner by an impartial jury.

### B.

■ For purposes of federal habeas corpus review, factual findings by a state court are presumed to be correct. 28 U.S.C. § 2254(d). While this presumption does not apply to the overall claim of ineffective assistance, *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070, the presumption of correctness does apply to a trial court's underlying factual determination that an individual juror is impartial. *Patton v. Yount*, 467 U.S. 1025, 1036–38, 104 S.Ct. 2885, 2891–92, 81 L.Ed.2d 847 (1984); *Adams v. Aiken*, 965 F.2d 1306, 1317 (4th Cir.1992), *vac'd on other grounds*, —— U.S. ——, 114 S.Ct. 1365, 128 L.Ed.2d 42 (1994). Therefore, this Court must decide merely "whether there is fair support in the record for the state courts' conclusion that the juror[s] ... would be impartial." *Patton*, 467 U.S. at 1038, 104 S.Ct. at 2892; *Aiken*, 965 F.2d at 1317.

■ Thomas claims that two seated jurors who were challenged for cause, Mr. Schwenker and Mr. Siperek, should have been excused by the trial court because their "minds were not 'free to hear and impartially consider the evidence' because of their views on interracial sex." Thomas argues that a juror opposed to interracial sex "would be prone to punish Thomas for even a consensual act or be inherently reluctant to accept that consensual sex occurred between a white woman and a black man." He further claims that Mr. Siperek should have been excluded on the additional ground that he was prepared to accord special deference to the testimony of police officers. However, the impartiality of these two jurors is a credibility determination that, given the deference due, is fairly supported by the record.[4]

Mr. Schwenker did not say that he objected to interracial sex. Indeed, when asked "How do you feel about sex between a black

man and a white woman?" he responded: "It is their affair," and "it is fine by me. It is not my business." His only stated concern was that he might have an objection to an 18–year old daughter marrying a black man because it "might make it rough on her for the rest of her life" although he first stated that such a marriage would be "her choice." Further, he expressed no objection to a daughter "going out with a black man" and denied any personal bias. There is sufficient support in the record for the trial court's determination that Mr. Schwenker would impartially consider the evidence presented as to the alleged consensual nature of Thomas's sexual encounter with Ms. Wilkins.

Similarly, Mr. Siperek stated that interracial sex "doesn't matter to me, really it doesn't." He did later state that he disapproved of interracial sex, but only because of the difficulties that a child from such a union might face. Most importantly, Mr. Siperek also responded affirmatively that he would accept testimony that a white woman likes sex with black men, and that he would follow the judge's instructions notwithstanding his own feelings. Thus, there is sufficient support for the trial judge's decision not to strike Mr. Siperek on the basis that his feelings about interracial sex would affect his impartiality.

■ As to police credibility, Mr. Siperek stated that all things being equal, he "would probably lean toward the officer" over the defendant "with a criminal record." This view is unimpeachable since certain criminal records have long been accepted as relevant to determining credibility. Further, Mr. Siperek stated that he accepted the possibility that a police officer could stage a crime or lie on the stand, and he affirmed that he would consider all of the evidence under the instructions given by the judge. Again, the judge's determination of impartiality is supported by the record.

The presence of Mr. Siperek and Mr. Schwenker on the jury did not undermine the reliability of the jury's verdict or make Thomas's trial fundamentally unfair. Thus, Thomas was not prejudiced by his counsel's

---

4. The voir dire of Mr. Schwenker is located at Ex. 8, Trial Transcript vol. II at 2.115–2.137.

The voir dire of Mr. Siperek is located at Ex. 11, Trial Transcript vol. V at 5.13–5.32.

failure to preserve objections to the composition of the jury.

## III.

■ In Ground Two and Ground Three of his petition, Thomas seeks a new trial or resentencing because the State violated his right to due process under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose evidence that was material to his defense. Under *Brady,* the government must disclose all evidence in its possession that is "both favorable to the accused and material to guilt or punishment." *U.S. v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985). Evidence is "material" only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383.

In developing corroboration for his self-defense theory, Thomas subpoenaed all Maryland State Police employment and criminal records pertaining to Mr. Spurling, who was formerly employed as a state trooper. The state police did not turn over certain reports on Mr. Spurling's involvement in loan-sharking violence and his previous associations with Thomas, even though they were generated before the subpoena was issued. Thomas claims that these state police reports on Mr. Spurling were material because their disclosure would have led to evidence that made Thomas's self-defense claim much more plausible.

■ The State has offered no justification for its failure to disclose the information, and its agents apparently ignored the wise admonition of the Supreme Court that "because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 2399–2400, 49 L.Ed.2d 342 (1976). Nonetheless, "the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.*

■ Thomas asserts that the undisclosed reports were material first because he relied on the nondisclosure as suggesting that "Mr. Spurling's character was unremarkable." However, Thomas's claimed reliance regarding Mr. Spurling's character is belied by the fact that he continued to assert self-defense and indeed put on evidence of Mr. Spurling's violent character.

Second, Thomas asserts that the reports were substantively material in that they, or evidence they would have led to, made an otherwise facially implausible self-defense claim much more credible. However, the Maryland Court of Appeals found that the reports would not have been admissible, and that even if they had been, the information that they contained was largely cumulative. *Thomas II,* 599 A.2d at 1181, 1184–86. The first holding is unassailable as a matter of state evidence law, and the second is entirely supported by the record. Thomas called two witnesses, Sam Houseman and Police Officer Norbert Leonarde, who testified to Mr. Spurling's inclination towards violence and involvement in debt collecting to support Thomas's self-defense theory.

Thomas's ancillary contention that the reports may have led to admissible evidence is entirely speculative. Investigation of the information in the reports would not have revealed any information regarding Mr. Spurling's actions on the night he was killed. Further, without any showing by Thomas as to the specific type of admissible evidence investigation of the reports would have generated, imagining possible effects on the trial is not sufficient to undermine confidence in the jury's finding of guilt or in the sentences imposed by the judge.

## IV.

In Ground Four, Thomas seeks a new sentencing hearing on the basis that Maryland's death sentencing procedure violates the Eighth and Fourteenth Amendments in that it uses a preponderance standard to determine whether aggravating circumstances outweigh mitigating circumstances. In Ground

Five, Thomas asserts that the existence of Maryland's allegedly unconstitutional jury sentencing scheme violated his Fourteenth Amendment right to due process even though he chose to be sentenced by the trial judge. Both of these claims are barred by the *Teague* nonretroactivity principle. *See generally Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

### A.

■■■ The Supreme Court has held that "[t]he nonretroactivity principle *prevents* a federal court from granting habeas corpus relief to a state prisoner based on a rule announced after his conviction and sentence became final." *Caspari v. Bohlen,* — U.S. —, —, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). Since respondents raise the nonretroactivity issue, this Court *"must* apply *Teague* before considering the merits of the claim." *Id.* (citation omitted).

Nonretroactivity analysis under *Teague* proceeds in three steps. *Id.; Turner v. Williams,* 35 F.3d 872, 879 (4th Cir.1994). First, a court must ascertain the date on which the defendant's conviction and sentence became final for *Teague* purposes. *Caspari,* — U.S. at —, 114 S.Ct. at 953. In Thomas's case, this date is March 25, 1985, the date on which the United States Supreme Court denied Thomas's petition for a writ of certiorari on direct review of his convictions and sentences.

Second, the court must examine the law as it existed at that time to determine "whether a state court considering [the defendant's] claim ... would have felt compelled by existing precedent to conclude that the rule [the defendant] seeks was required by the Constitution." *Id.* (quoting *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990)). In some cases, the determination of whether the petitioner is seeking the announcement of a new rule by extending existing law or merely seeking the application of existing precedent to a new factual setting can be an exceedingly difficult one. Likewise, the exact legal standard to be applied in making those determinations continues to be the source of much debate. *See, e.g., Turner,* 35 F.3d at 887 n. 16.

Third, if the petitioner is seeking the announcement of a "new rule" of constitutional law, the court can apply the new rule only if it falls within one of two narrow exceptions to the nonretroactivity principle. The "first exception is for new rules that 'place certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *Caspari,* — U.S. at —, 114 S.Ct. at 956 (quoting *Teague,* 489 U.S. at 307, 109 S.Ct. at 1073). The "second exception is for 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Caspari,* — U.S. at —, 114 S.Ct. at 956 (quoting *Saffle,* 494 U.S. at 495, 110 S.Ct. at 1264).

### B.

■■■ As to Ground Four, Thomas's own argument regarding the merits of his claim essentially admits that acceptance of his claim would require the announcement of a new rule of constitutional law. Thomas cites two cases that existed before his conviction became final that hold that due process requires a higher standard than preponderance: *Stantosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). However, those cases involved involuntary civil commitment and severance of parental rights, and Thomas asserts only by extension and in the most conclusory fashion that a higher standard is also required in determining whether aggravating circumstances outweigh mitigating circumstances in capital sentencing proceedings. Further, Thomas admits that his argument requires speculation as to whether "a majority of the Supreme Court [would] accept the argument Mr. Thomas makes." Reply to Answer at 4. Thus, the legal basis for Ground Four is clearly not dictated by precedents that existed in March 1985 and would therefore be a new rule whose application here is barred by the nonretroactivity principle unless an exception applies.

The new rule asserted by Thomas in Ground Four, that the standard of proof in determining whether aggravating circumstances outweigh mitigating circumstances

must be higher than a preponderance, does not meet either exception to the nonretroactivity principle. The rule neither places individual conduct beyond the authority of the state to proscribe nor does it implicate the fundamental fairness and accuracy of the sentencing proceeding.

### C.

■ As to Ground Five, Thomas cites no case law that supports the heart of his argument that due process was violated because he was forced to choose between being sentenced by the trial judge or by a jury constrained by unconstitutional procedures.[5] Thomas correctly asserts that sentencing juries are subject to due process restraints *when they actually are used* to sentence a defendant, *e.g. Morgan v. Illinois,* —— U.S. ——, ——, 112 S.Ct. 2222, 2228, 119 L.Ed.2d 492 (1992), and that waiver of *established* constitutional rights must be knowing and meaningful, *e.g. Brewer v. Williams,* 430 U.S. 387, 404–06, 97 S.Ct. 1232, 1242–43, 51 L.Ed.2d 424 (1977). However, such principles are irrelevant to the heart of his due process challenge. The critical fact is that Thomas was not sentenced by a jury. Further, the Constitution does not require a state to give a convicted defendant the option of being sentenced by a jury. *Spaziano v. Florida,* 468 U.S. 447, 464, 104 S.Ct. 3154, 3164, 82 L.Ed.2d 340 (1984). Thus, Thomas had no absolute constitutional right to a "meaningful" choice between a sentencing jury and judge.

Nor does the new rule advocated by Thomas in Ground Five, that due process is violated when a defendant chooses to be sentenced by a judge over an unconstitutional jury, fit either of the exceptions to the nonretroactivity doctrine. Thomas argues that since *Mills* has been held to fit within the second exception, so too should his Ground Five due process claim be recognized. *See Williams v. Dixon,* 961 F.2d 448, 456 (4th Cir.) (holding that the rule established by *Mills* is a "bedrock procedural element[ ] ... implicit in ordered liberty"), *cert. denied,* —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992). However, as discussed *supra* note 5, Thomas's claim is completely distinguishable from the *Mills* case. Thomas was not sentenced by a *Mills* jury and the Eighth Amendment values of full consideration of mitigating circumstances that underlie *Mills* are not implicated in this case where Thomas was sentenced by a judge who was able to freely consider all evidence of mitigating circumstances. The "fundamental fairness and accuracy of the criminal proceeding" is not called into question since Thomas was in fact sentenced by the trial judge whose lack of bias and ability to consider all mitigating evidence has not been challenged.

### V.

In his sixth ground for habeas relief, Thomas claims that he was denied effective assistance of counsel when his trial counsel consented to a postconviction interview outside the presence of counsel by Dr. Spodak, a psychiatrist who had been employed by the State's Attorney's office to testify at Thomas's sentencing hearing.[6]

■ Again, to successfully assert an ineffective assistance of counsel claim, Thomas must show both (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the pro-

---

**5.** Thomas places much reliance on *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), which held that Maryland's use of a jury sheet, that would have been used had Thomas chosen a sentencing jury, unconstitutionally restricted the jury's ability to consider mitigating circumstances, especially in connection with the jury instructions given in that case. However, *Mills* stands, at most, for the proposition that Maryland's jury sentencing scheme was facially unconstitutional in all situations. *But see Thomas II,* 599 A.2d 1179 (concluding that *Mills* is not applicable to Thomas's case because *Mills* had

held only that the *combination* of the jury sheets and the jury instructions was unconstitutional; whereas there was no way to know what jury instructions would have been given to Thomas's sentencing jury since he chose to be sentenced by a judge).

**6.** Thomas also seeks an evidentiary hearing relating to Ground Six. Since this ineffectiveness claim can be fully resolved on the present record, I will deny Thomas's request for an evidentiary hearing relating to this ground.

ceedings would have been different." *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. at 2064, 2068. This Court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," and "apply[ ] a heavy measure of deference to counsel's judgments." *Id.* at 690–91, 104 S.Ct. at 2065–66. Further, while "state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of [28 U.S.C.] § 2254(d) ... both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact," and are determined by this Court de novo. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070.

Between Thomas's conviction and his sentencing hearing, one of the prosecutors on the case called Kinsley to obtain his consent to having Dr. Spodak interview Thomas. Dr. Spodak had been a member of the neutral Perkins panel that had evaluated Thomas for competence and sanity before trial. However, at some point Dr. Spodak was retained as an expert by the State's Attorney's office for the purpose of testifying at Thomas's sentencing. Kinsley consented to the interview, and the trial court, upon motion by the State's Attorney's office, ordered the interview to take place. Kinsley further instructed his client to fully cooperate with Dr. Spodak and did not attend the interview. At Thomas's sentencing, Dr. Spodak testified and his written report was admitted into evidence, all over the repeated and strong objections of Kinsley who stated that at the time of his consent, he did not know Dr. Spodak had been retained by the State's Attorney's office.

### A.

 Even applying a heavy measure of deference to the "judgments" that he made in this case, Kinsley's consent and failure to attend the postconviction interview of Thomas by Dr. Spodak fell below the level of reasonably competent representation guaranteed by the Sixth Amendment. Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unneces-

sary." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. Kinsley "neither investigated, nor made a reasonable decision not to investigate" the facts and law surrounding the critical decision to allow Dr. Spodak to interview Thomas unchaperoned. *Kimmelman v. Morrison*, 477 U.S. 365, 385, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986).

It is undisputed that at the time of his consent, Kinsley did not know Dr. Spodak would interview Thomas as an expert for the prosecution, not as an impartial employee of Perkins. Further, Kinsley testified repeatedly that he had no idea about the purpose of the interview by Dr. Spodak. He did not know the specific type of testimony given or issues raised in death penalty hearings, he did not know what type of information Dr. Spodak was looking for, or even that Dr. Spodak was going to testify at the sentencing. *E.g.*, Ex. 44, Joint Record Extract vol. III at 3.136–3.140. Kinsley thought that Dr. Spodak was merely going to update his "bland" written competence/sanity report. Further, Kinsley did not consider that he likely could have prevented Dr. Spodak from testifying at Thomas's sentencing if he did not consent to the interview. Ex. 44 at 3.204, 3.508. In short, Kinsley's consent to Dr. Spodak's interview was given in complete ignorance.

Dr. Spodak, on the other hand, knew exactly what he was doing. Maryland law required that, before imposing a sentence of death, a trial court determine whether a number of mitigating circumstances existed, including impaired capacity and lack of future dangerousness. At Thomas's sentencing, Dr. Spodak testified that he interviewed Thomas with the specific intent of evaluating whether Thomas's capacity was substantially impaired and whether he would constitute a continuing threat to society. Ex. 32, Sentencing Transcript vol. III at 3.10.

As to Kinsley's failure to be present at the interview, again he acted in ignorance, not after a reasoned decision. Indeed, he expressly testified that he did not actually consider the consequences of his not attending the interview. His testimony reveals: "Q: You felt that your client would be better served without you there? A: Well, I can't

answer that. I don't know. That thought didn't enter my mind." Ex. 58, Joint Record Extract vol. V at 5.134–5.135. He stated repeatedly that he never thought to attend the postconviction interview simply because he had never attended pretrial sanity evaluations.

Kinsley acted under this cloud of misconceptions, and he failed to make even the most rudimentary inquiries that would have revealed the gravity of the situation. He did not ask the State about why it sought to have Dr. Spodak interview Thomas or inquire into what capacity Dr. Spodak would interview Thomas. Nor did Kinsley appear to consider the legal implications of his consent. While the record establishes that Kinsley had only the best intentions for his client, his "decisions" to consent and not attend the interview were not reasoned judgments in any respect.

### B.

While no reasonable defense attorney should ever blindly consent to a prosecution request for a psychiatric interview without considering the identity of the interviewer, and the purpose and legal implications of the interview, Kinsley had other information that made his actions here even more unreasonable. Prior to trial, Kinsley had received unfavorable psychiatric reports from two defense experts, Dr. Beran and Professor Brown. The state postconviction courts found that Kinsley, despite some communication problems, spoke with Dr. Beran about sentencing and was told that Dr. Beran did not want to be called as a witness since his psychiatric testimony would "affirmatively harm" Thomas at sentencing. *Thomas III*, 616 A.2d at 374; Ex. 58 at 5.159. This factual finding is fairly supported by the record. Ex. 58 at 5.84, 5.117, 5.118, 5.121. Also prior to trial, Kinsley had reviewed a report by Professor Brown, a psychologist at the University of Maryland who was retained by the defense. The report contained information that Kinsley believed strongly indicated Thomas's future dangerousness and lack of impairment, evidence that would negate two possible mitigating factors in death penalty sentencing. Kinsley thought the report would be "dynamite against us" at sentencing. Ex. 58 at 5.125.

Thus, by the time he consented to the state request for a psychiatric interview, Kinsley already had his own two psychiatric experts telling him that their evaluations produced conclusions that would greatly harm Thomas at sentencing. At the very least this information would have put reasonable counsel on notice that a psychiatric interview could produce strongly damning evidence, and should not be consented to without extreme caution and careful consideration of the consequences of such an interview.

### C.

The explanation that Kinsley offers for his consent can only be described as one of desperate hope. He testified that he only consented to the interview because (1) he thought Dr. Spodak was impartial, not retained by the State's Attorney's office; and (2) given that, he was hopeful that something favorable, anything, would somehow result from the interview. Respondents' attempt to characterize this justification as a reasonable strategic choice is unpersuasive. Kinsley's actions were neither strategic nor reasonable.

In two separate proceedings, Kinsley characterized his reasoning as "why not." Ex. 44 at 3.123; Ex. 58 at 5.105. To paraphrase his testimony, he thought "why not let an impartial expert take a shot" since he had received only damaging information from his own experts. Such an act of desperate hope is not constitutionally effective because it is neither reasonable nor strategic. Any but the most malicious attorney would hope that even his blindly chosen, unreasonable actions would somehow result in a positive outcome for his client. For example, if defense counsel acceded to a request made by the State to look through all of the defense files, with no consideration as to possible damage to his client or his waiver of privileges, in the hope that the prosecutors might find something useful that he had not found, his action would be entirely unreasonable and unprofessional however pure his intentions might have been. Kinsley's consent to the interview by Dr. Spodak was substantive-

ly the same, and it can be considered "strategic" only if that term is stripped of any content beyond having a marginally articulable justification. Uninformed hope is not sound trial strategy.

Moreover, even truly strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Kinsley's failure to even cursorily investigate or consider the implications of his consent to the interview was not supported by anything approaching a "reasonable professional judgment." Instead, the consent was motivated by erroneous assumptions about the role of Dr. Spodak and the purpose of the interview, misperceptions that would have been corrected by simple inquires. Thus, even if Kinsley's actions were "strategic," they clearly were not reasonable.

### D.

The Supreme Court has noted that a decision regarding psychiatric evaluations in capital cases "is 'literally a life or death matter' and is 'difficult ... even for an attorney' because it requires 'a knowledge of what other evidence is available, of the particular psychiatrist's biases and predilections, [and] of possible alternative strategies at the sentencing hearing.'" *Estelle v. Smith,* 451 U.S. 454, 471, 101 S.Ct. 1866, 1877, 68 L.Ed.2d 359 (1981) (quoting *Smith v. Estelle,* 602 F.2d 694, 708 (5th Cir.1979)). In the face of such a difficult and critical decision, it would be second-guessing for a court to substitute its judgment for the reasoned though ultimately erroneous judgment of trial counsel. However, it is not second-guessing, in the face of such a difficult and critical decision, to recognize that Kinsley failed to act as the constitutionally-guaranteed counsel when he consented to the prosecution's request without any reasoned consideration or investigation.

Kinsley's consent to Dr. Spodak's interview, his failure to attend the interview, and his failure to investigate the law and facts

surrounding the interview were each unreasonable. Kinsley's actions, after no consideration or investigation into the fatally adverse implications it could have for his client, constituted an abandonment of his role as counsel such that he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Kinsley's hope for a positive outcome does not change that fact. His testimony regarding his ignorance and lack of investigation are sufficient to overcome the presumption that he "made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066.

### E.

Prejudice based on Kinsley's consent to the interview is essentially conceded by respondents. *Accord Thomas III,* 328 Md. 541, 616 A.2d 365, 374 n. 3 (1992). Kinsley stated repeatedly that if he had known Dr. Spodak was retained by the prosecution, he would not have permitted the interview. Further, Dr. Spodak's sentencing testimony strongly refuted possible mitigating factors by emphasizing his opinion that Thomas suffered from no mitigating mental incapacity and was a serious risk of future dangerousness to society and to the prison population. Most importantly, the sentencing judge relied heavily on Dr. Spodak's opinion in imposing the death sentence for the murder of Mrs. Spurling. The judge cited Dr. Spodak's testimony as critical in his decision not to find two statutorily specified mitigating circumstances: impaired capacity and future dangerousness. Ex. 43, Joint Record Extract vol. II at 2.535–2.543. Therefore, there is at least a reasonable probability that, but for Kinsley's error leading to Dr. Spodak's sentencing testimony, the result of the sentencing proceeding would have been different. The breakdown in the adversarial process was sufficient to undermine my confidence in the reliability of the sentencing decision that relied so heavily on testimony resulting from Kinsley's error.[7]

---

7. The question of whether Kinsley's failure to attend the interview was prejudicial to Thomas's sentencing is more difficult to answer because it

requires some degree of speculation. However, it seems reasonable to assume that by attending, Kinsley would have discovered the role of Dr.

## VI.

In Ground Seven, Thomas seeks a new sentencing hearing based on an allegedly improper relationship that existed between the State's Attorney's office and Dr. Spodak. Thomas alleges that Dr. Spodak volunteered to serve on the Perkins panel which evaluated Thomas at the behest of the prosecution. He concludes that the subsequent use of Dr. Spodak's testimony violated his Fifth and Sixth Amendment rights under *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

In *Estelle*, the trial court *sua sponte* ordered a competency evaluation of a capital defendant. At the defendant's sentencing, the state called as a witness the examining psychiatrist, who relied on statements made by the defendant at the competency evaluation to state his opinion that the defendant constituted a continuing threat to society. The Supreme Court concluded that the use of the psychiatrist's testimony in the circumstances of that case violated the defendant's Fifth and Sixth Amendment rights. *Id.* at 473, 101 S.Ct. at 1878.

■ However meritorious Thomas's *Estelle*-based constitutional objection to Dr. Spodak's testimony may be, it is procedurally barred.[8] The procedural default rule prevents federal habeas review of a claim that has been decided by a state court on the basis of a state procedural rule. *Coleman v.*

*Thompson*, 501 U.S. 722, 729–30, 111 S.Ct. 2546, 2553–54, 115 L.Ed.2d 640 (1991). The default rule has developed out of concerns for comity and federalism and seeks to protect "the State's legitimate reasons for holding the prisoner," and "the States' interest in correcting their own mistakes." *Id.* at 730, 732, 111 S.Ct. at 2555. Absent a showing (which Thomas has not made) of cause and prejudice, or actual innocence, a petitioner's claim is barred where the state court has expressly relied on procedural default to deny relief.

■ The Maryland Court of Appeals in *Thomas I* clearly held as an independent and adequate state ground that Thomas had waived his constitutional objection to Dr. Spodak's testimony. The *Thomas I* court stated: "We think it clear that [Thomas's] objection to Dr. Spodak's testimony and report was not based on constitutional principles enunciated [sic] in *Estelle* but rather was predicated solely on a non-constitutional basis." *Thomas I*, 483 A.2d at 23. The court further held that under Maryland law, a defendant "will ordinarily be deemed to have waived grounds not specified." *Id.* While the court in *Thomas I* went on to discuss, in the alternative, the merits of Thomas's *Estelle* claim, the procedural bar rule does apply when the state court has alternatively discussed the merits, as long as the court has explicitly invoked the state procedural rule

Spodak and the type of information that Dr. Spodak was seeking to develop. Kinsley testified repeatedly that he would have prevented the interview had he known of Dr. Spodak's relationship with the prosecution and that he would have made attempts to refute Dr. Spodak's testimony if he had known of its contents. Thus, it is reasonably likely that the scope and impact of Dr. Spodak's testimony, even if not wholly prevented, would at least have been significantly diminished if Kinsley had attended the interview. However, I need not reach the question of prejudice resulting from Kinsley's non-attendance since the finding of prejudice resulting from his consent and failure to investigate is sufficient for purposes of Thomas's ineffectiveness claim.

8. I note that Thomas's allegations, if true, do raise serious concerns. Thomas has produced some evidence of a relationship between the State's Attorney's office and Dr. Spodak that may have been overly amicable and coordinated. For example, the prosecutor's handwritten notes of a preinterview conversation with Dr. Spodak in-

clude notations such as "Don't want def. atty to sit in" and "are they alleging intoxication or what." Exhibit 44 at 3.508. Further, Dr. Spodak testified that he did sit on other competency evaluation panels at the request of the State's Attorney's office.

The State of Maryland relies on state-appointed psychiatrists, such as those on the Perkins panel including Dr. Spodak, to serve a critical and impartial role in its criminal justice system. *See Johnson v. State*, 292 Md. 405, 439 A.2d 542, 548 (1982). A close, mutually dependent relationship between Dr. Spodak and the prosecution would undermine this critical impartiality. Therefore, I would be inclined to grant Thomas's request for an evidentiary hearing to further examine the alleged misconduct were it not for the facts that (1) I find this claim to be procedurally barred, and (2) in any event, I am granting relief on the basis of Thomas's Ground Six ineffective assistance claim, *supra* part V.

as a separate basis for the decision, as it did in *Thomas I*. *Harris v. Reed*, 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 1044 n. 10, 103 L.Ed.2d 308 (1989); *Felton v. Barnett*, 912 F.2d 92 (4th Cir.1990), *cert. denied*, 498 U.S. 1032, 111 S.Ct. 693, 112 L.Ed.2d 683 (1991).

■ Despite contentions to the contrary, Thomas did not reassert, during the state postconviction proceedings, his constitutional objections to the prosecutor-Spodak relationship and the admission of Dr. Spodak's testimony. Even if he had done so, Thomas could not, as he appears to assert, remove the procedural bar simply by unilaterally re-raising the constitutional issue.[9]

## VII.

One of Thomas's claims in Ground Eight, that the prosecution actually misled him regarding its relationship with Dr. Spodak, is precluded by state court findings. The Maryland Court of Appeals correctly noted that "[t]he hearing judge after weighing disputed testimony as to who said what to Mr. Kinsley, expressly found that there was no deception by the State in connection with procuring Kinsley's consent." *Thomas II*, 599 A.2d at 1179. This finding is fairly supported by the record and must be given deference under 28 U.S.C. § 2254(d).

■ Alternatively, Thomas claims that the prosecution did not meet its purported affirmative duty to inform Kinsley that Dr. Spodak was its agent. However, the constitutional principles upon which Thomas relies for this affirmative duty are simply too general to dictate the remedy he seeks, and his claim is thus barred by the *Teague* principle of nonretroactivity.

In his submissions, Thomas relies heavily on the language of *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985), for the proposition that the prosecution has an "affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." However, *Moulton* was decided after Thomas's conviction became final for *Teague* purposes, and thus is not part of the "legal landscape" then existing to which this court must look to determine whether it is being asked to announce a new rule of constitutional law. *Bohlen*, —— U.S. at ——, 114 S.Ct. at 953. Further, to the extent that the quoted language of *Moulton* restates already existing law, it enunciates a very general principle that cannot be said to compel the relief Thomas seeks. While it is true that the prosecution has myriad affirmative obligations relating to a defendant's Sixth Amendment rights, Thomas has not specified the duty that has been breached in his case. As the Fourth Circuit has noted, "*Teague* would be meaningless if habeas petitioners could benefit from the application of pre-existing rules at too high a level of generality." *Turner*, 35 F.3d at 888 n. 16 (citing *Sawyer v. Smith*, 497 U.S. 227, 236, 110 S.Ct. 2822, 2828, 111 L.Ed.2d 193 (1990)).

Thomas also relies on earlier cases that support the language found in *Moulton*, such as *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), and *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). These cases are, however, all distinguishable. The Supreme Court had clearly held by the time of Thomas's conviction became final that the government may not plant a paid informant in a defendant's cellblock or wire a codefendant with the intention of eliciting incriminating statements from the defendant. However, Thomas does not explain how the Sixth Amendment is violated when, as here, the State informed Thomas's counsel that it

---

9. In addition to the procedural bar, I have concern that Thomas's *Estelle* claim might also be barred by *Teague* nonretroactivity. *See generally supra* part IV. An improper relationship between Dr. Spodak and the State's Attorney's office may have been, as Thomas claims, against "the spirit of *Estelle*." However, the current record, including depositions of all principals in the Thomas case, suggests that habeas relief would not be *compelled* by *Estelle*. *Estelle* rested on both Fifth and Sixth Amendment principles.

451 U.S. at 473. In Thomas's case, the Fifth Amendment issues seem to be factually distinguishable, *see Thomas I*, 483 A.2d at 23–24, and Thomas's success on the Sixth Amendment issues would likely require a finding of affirmative deception by the prosecution, *see Thomas I*, 483 A.2d at 35 (Eldridge, J., dissenting). Here, the state courts made an express factual finding, fairly supported by the record, that there was no such deception. *Thomas II*, 599 A.2d at 1177.

wished to have Dr. Spodak interview Thomas and obtained consent to the interview without deception.

## VIII.

In Ground Nine, Thomas seeks a new sentencing hearing based on ineffective assistance of counsel. He claims that his trial counsel's failure to develop psychiatric mitigating evidence for use at sentencing was both unreasonably deficient and prejudicial. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Once again, trial counsel's performance must be judged for reasonableness at the time and under the circumstances which the actions were taken. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. "Particularly when evaluating decisions not to investigate further, we must regard counsel's choices with an eye for 'reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.'" *Bunch v. Thompson,* 949 F.2d 1354, 1363 (4th Cir. 1991) (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066).

The Circuit Court for Baltimore County, after holding its evidentiary hearings on postconviction review, found that trial counsel, Kinsley, and the defense psychiatrist, Dr. Beran, did discuss sentencing issues and that Dr. Beran stated his testimony would affirmatively harm Thomas. Ex. 58 at 5.159. This finding is fairly supported by the record and thus deserves deference under 28 U.S.C. § 2254(d). *See* Ex. 58 at 5.84, 5.117, 5.118, 5.121. Kinsley also based his decision not to pursue further psychiatric evidence on his examination of a psychological report compiled by Professor Brown that Kinsley thought was "dynamite against us" because it suggested Thomas's future dangerousness. *Id.* at 5.125. Kinsley testified that the results of the psychiatric evaluation done by Brown "worried the devil out of me to have the judge hear that when I'm asking in mitigation." *Id.* Against the background of this consistently negative information that he had

received, Kinsley's decision not to pursue more psychiatric evidence has not been shown to have been unreasonable.[10]

The primary case relied on by Thomas is not directly on point because it involved trial counsel who completely failed to pursue any psychiatric evidence of mitigation for the sentencing phase. *Stephens v. Kemp,* 846 F.2d 642 (11th Cir.), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988). Closer to the instant case is *Pruett v. Thompson,* 996 F.2d 1560 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 487, 126 L.Ed.2d 437 (1993), in which the defendant's ineffectiveness claim, that his counsel was deficient because his efforts to develop psychiatric evidence of mitigation were ultimately unsuccessful, was denied. At some point, an attorney must make the professional judgment that further investigation in a certain area will be fruitless. Kinsley testified that by the time of Thomas's conviction, he "had all the medical advice that [he] needed. How far do you go?" Ex. 58 at 5.112. In this case, the available information at the time that Kinsley received from Dr. Beran and Professor Brown made reasonable the decision not to pursue the psychiatric mitigation area further.

Thomas also requests an evidentiary hearing relating to his ninth ground for relief. However, the record and the Circuit Court's findings of fact are entirely sufficient to resolve the claim now before the Court.

## IX.

In his tenth ground, Thomas alleges that the "cumulative effect" of Kinsley's errors constitute ineffective assistance of counsel. However, the Supreme Court has expressly held that "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Aggregating alleged missteps that them-

10. Thomas also argues that Kinsley's performance was unreasonable because the Brown report could have actually been useful in establishing mitigating circumstances, and because Kinsley relied on Dr. Beran and Professor Brown in

the first place after he had a limited and often ineffective working relationship with them. However, such a conclusion would require the type of second-guessing of counsel's judgments that is expressly forbidden under *Strickland.*

selves do not constitute ineffective assistance is not sufficient to meet that standard in this case.

A separate order denying Thomas's request for an evidentiary hearing, granting his petition for habeas corpus only as to the resentencing sought in Ground Six, vacating his death sentence, and remanding to the Circuit Court for Baltimore County for resentencing is being entered herewith.